# EXHIBIT 3

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------------X

NOELLE FELDMAN,

                Plaintiff,

    -against-

WILLIAM KNACK,

                Defendant.

-------------------------------------------------------------------X

Index No.: 69747/2014

**DECISION AND ORDER**
**WITH NOTICE OF ENTRY**

Assigned Justice:

Hon. Terry Jane Ruderman

    **PLEASE TAKE NOTICE** that the within is a true copy of the Decision and Order of the

Hon. Terry Jane Ruderman of the Supreme Court of the State of New York, Westchester County,

dated July 19, 2017 and entered on July 19, 2017.

Dated:  White Plains, New York
        July 20, 2017

                    BLEAKLEY PLATT & SCHMIDT, LLP

                    By: _____
                        Justin M. Gardner
                    *Attorneys for Plaintiff*
                    One North Lexington Avenue
                    White Plains, NY 10601
                    (914) 949-2700

TO:    Michael Greenspan, Esq.
        GREENSPAN & GREENSPAN
        *Attorney for Defendant-Appellant*
        188 East Post Road, Suite 401
        White Plains, NY 10601
        (914) 946-2500

        Joseph J. Brophy, Esq.
        MCCARTHY FINGAR LLP
        *Attorneys for Defendant*
        11 Martine Avenue
        White Plains, NY 10606
        (914) 946-3700

To commence the statutory time for appeals as of right
(CPLR 5513[a]), you are advised to serve a copy
of this order, with notice of entry, upon all parties.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
--------------------------------------------------------x
NOELLE FELDMAN,

                    Plaintiff,                    DECISION and ORDER
                                  Motion Sequence No. 6
      -against-                       Index No. 69747/2014

WILLIAM KNACK,

                    Defendant.
--------------------------------------------------------x
RUDERMAN, J.

      The following papers were considered in connection with defendant's post-trial motion

pursuant to CPLR 4404(a)[1] for an order setting aside the jury verdict and the judgment entered

thereon, and granting judgment for defendant, directing a new trial or granting remittitur of the

awarded damages:

| Papers | Numbered |
|---|---|
| Notice of motion, affirmation, exhibits TTE, TT2, T1, T2 | 1 |
| Affirmation in opposition, exhibits 1 - 5, memorandum of law | 2 |
| Reply affirmation | 3 |

      This is a civil rape case brought by plaintiff Noelle Feldman against her former therapist,

William Knack, a clinical psychologist. Plaintiff asserted that on or about January 10, 2013,

when she was at his office for a therapy session, he forcibly raped and assaulted her. Plaintiff's

case was largely based on her testimony and recordings of two telephone conversations between

plaintiff and defendant. Her testimony was subjected to substantial credibility challenges, based

---

[1] A branch of defendant's motion also seeks renewal of defendant's trial motion brought
pursuant to CPLR 4401.

1

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170    RECEIVED NYSCEF: 07/19/2017

on, among other things, her conduct and statements to others after the date in question, in which

she did not mention rape or take any steps in response to the rape. Defendant provided an

alternative narrative as to what occurred between the parties, testifying at length as to plaintiff's

mental illness, specifically denying plaintiff's assertions regarding the claimed assault and rape

in January 2013. He countered that, in fact, plaintiff had sexually assaulted him, albeit on a

different date. His case provided a significant basis for rejecting plaintiff's testimony. Yet,

having heard all the evidence, the jury rejected defendant's evidence and found in favor of

plaintiff. It awarded her compensatory damages of $250,000 for past pain and suffering,

$200,000 for future pain and suffering, and $500,000 for punitive damages. Judgment has been

entered thereon.

Defendant now moves to set aside the jury verdict and the resulting judgment.

### Discussion

For a court to set aside a jury verdict in favor of a plaintiff and grant a defendant

judgment as a matter of law under CPLR 4404(a), it must "first conclude that there is simply no

valid line of reasoning and permissible inferences which could possibly lead rational [persons] to

the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v*

*Hallmark Cards, Inc.*, 45 NY2d 493, 499 [1978]). The court must consider the evidence in the

light most favorable to plaintiff, and afford her every inference which may be drawn from the

presented evidence (*see Tapis v Dattco, Inc.*, 32 AD3d 842 [2d Dept 2006]).

The standard to set aside the verdict as against the weight of the evidence and remit the

matter for a new trial under CPLR 4404(a), while somewhat less stringent, still requires a

determination that "the evidence so preponderate[d] in favor of the [defendant] that [the verdict]

could not have been reached on any fair interpretation of the evidence" (*Lolik v Big V*

2

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170    RECEIVED NYSCEF: 07/19/2017

*Supermarkets*, 86 NY2d 744, 746 [1995] [internal quotation marks and citations omitted]).

> "It is for the jury to make determinations as to the credibility of the witnesses, and great deference in this regard is accorded to the jury, which had the opportunity to see and hear the witnesses. Where the verdict can be reconciled with a reasonable view of the evidence, the successful party is entitled to the presumption that the jury adopted that view"

(*Pierre v Andre*, __ AD3d __, 2017 NY Slip Op 05253, 2017 NY App Div LEXIS 5172 at *2, 2017 WL 2799983 at *1 [2d Dept June 28, 2017] [internal citations omitted]).

The Court therefore turns to a review of the evidence.

<u>Plaintiff's Evidence</u>

Plaintiff began her testimony by discussing her lifelong experiences with abusiveness. She described how, as a child, beginning in kindergarten, she was raped by her father each week until he left the home when she was eight and a half years old. She further recounted other traumatic childhood events, including being kicked out of the house by her mother after trying to protect her brain-damaged sister from her mother's abuse, being sexually abused by her brother, and her father's shooting to death of her brother. She also related her continuing issues with alcohol addiction.

According to plaintiff's testimony, she began psychological treatment with defendant in 2011, having been referred to him by her marriage counselor. She said that defendant's questionable conduct toward her started in January 2012 after she returned from a 12-day stay at Silver Hill, an in-patient psychiatric facility in Connecticut. At that first session back, defendant gave her a big hug, making her feel uncomfortable. From that time on, she said, defendant began to make comments on her appearance. He also sometimes tried to kiss her, and when she said "Stop," he responded, "I'm sorry, I'm really sorry, I could get in a lot of trouble for this." Plaintiff described how once, in the spring of 2012, as she sat on the treatment room sofa,

3

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170    RECEIVED NYSCEF: 07/19/2017

defendant stood up from his chair, approached her, and then dropped first his pants and then his underwear, at which point plaintiff grabbed her belongings and left. Rather than refusing further treatment with him, plaintiff returned and asked defendant why he did these things. Defendant replied, "I love my wife, I'm sorry, I could get in a lot of trouble for this," and promised not to do it again.

Following plaintiff's mother's death in April 2012, plaintiff was re-admitted to the inpatient facility for 45 days. During her stay there, defendant called her once to ask how she was doing, and to say he could not wait to see her. She subsequently resumed treatment with defendant, although he sporadically continued to engage in the behavior that made her feel uncomfortable.

Plaintiff's testimony regarding her claim of forcible rape on January 10, 2013 was as follows:

A. I arrived at his office and sat in my usual spot and I was so upset, I was so upset and again he came over like you need a hug. But I don't believe to be touched. I don't like to be touched. And I said, no, no, no. He sort of perched – I would always sit to the right of the couch and he would sit diagonally from me. He came over and kind of perched himself on the right arm of the sofa where I was. And then he lunged at me and, you know, pushed me down on the sofa on my back.

Q. Did you struggle to get him off?

A. I did.

Q. Did you say anything?

A. I don't think so. I think I just like – I remember just like whimpering. I felt there was no use.

Q. What happened next?

A. He – he, like, he pulled my underwear down and he raped me.

4

Q.    Did he have sex with you?

A.    Yes.

    \*    \*    \*

Q.    Besides intercourse, did Dr. Knack do anything else to you?

A.    Yes.

Q.    What did he do?

A.    At some point he like flipped me over and he bit me. He bit me really, really hard.

Q.    Where?

A.    On my backside. Really hard. Really hard.

Q.    What happened after he bit you?

A.    I – I scrambled up and pulled myself, like, together, and I grabbed my coat and my bag and left. Before I left he looked very smug.

Plaintiff also testified about an email she sent to defendant on November 14, 2013, in which she complained about defendant's "sexual acting out" by hugging her so hard it left bruises, kissing her on the couch, and commenting on her clothes and body "in a sexual voice."

In support of her claim, plaintiff also offered recordings of two separate telephone conversations she initiated with defendant on her cellular telephone, in the presence of a police detective with the New Castle Police Department. Both conversations, referred to by the detective as "controlled phone calls," were digitally recorded using equipment provided and set up by the detective at police headquarters.

In the first controlled phone call, on June 18, 2014, defendant asked plaintiff what was going on and how she was doing, and the following conversation took place:

NF:    Well, good and bad because, good because I've been going to a lot of meetings

5

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170    RECEIVED NYSCEF: 07/19/2017

and I have a sponsor and I'm working like on my 4th step now for a while."

WK:    Uh huh, that 4th step is usually a hard uh, a hard time

NF:    Yeah, and it really has been. Especially because, like, you know I don't – I don't know – I just (sigh) I really don't want to talk to her about what happened in your office . . . but I need some closure.

WK:    Uh hum.

NF:    But I need some closure

WK:    Okay, okay

NF:    And, uh, I just, I really – I don't know, I'm having a hard time with it – I – I – I really – You know I told you I – at – at the first session I said I don't think I could ever trust a man

WK:    Um, hum

NF:    And I did – [inaudible] trust you, but you know – I feel like, I do feel like you owe me an apology

WK:    Well, you know, I would like to talk this through with you. I was – I was kind of shocked when I got your letter – um – you know, and a little frightened too because I felt like I could trust you – you know, and then there was a – you know, we talked about a lot of stuff, I mean, nothing, nothing just happened. There was a lot of discussion about – about all of this. So I would like to be able to talk it through with you, um, but you know – I need to know that you're ok with doing that.

The conversation then focused on when and how they could continue the discussion.

The second controlled phone call took place on July 17, 2014. However, for approximately eight minutes at the beginning of the call, the recording device failed to pick up defendant's side of the conversation. That portion of the recording contains only plaintiff accusing defendant, such as: "What you did was wrong" "I came to you to you for help, why did you do it?" "I came to you for help and you took advantage of that." Then the recording contained the following interchange:

6

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171                                          RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                          RECEIVED NYSCEF: 07/19/2017

NF:     What was your goal Dr. Knack.. What was your goal?

WK:     It wasn't my intention

NF:     You should feel terrible. You should feel terrible. I want you to feel terrible
        That's – basically – quite frankly is one of my goals, I want you to feel terrible. I
        want you to be sorry for what you did. I want you to tell me you're sorry for what
        you did. I want to hear you tell me you are sorry for what you did. You took
        advantage of me, of my vulnerability, of the – of everything. It was wrong. It
        was wrong. You know, I've done a lot of reading on this since all this happened,
        you know, and I know it's called counter-transference. You're wrong. You know
        – you're a psychologist.. You're trained to, to, to help people. You were
        supposed to help me not hurt me and you hurt me, badly.

WK:     So what I'm trying to communicate to you, is that would be the last thing that I
        wanted to have happened. You are right that I was wrong just by virtue of the
        fact that you've been hurt, clearly, I was wrong.

NF:     You must have known you were wrong.

WK:     I do. Well, but I felt differently about it at the time Noelle. We have worked
        together for quite a while, I developed feelings for you. I let myself act on those
        feelings. We did have many conversations about it because I know that this is not
        something that is supposed to happen and I guess that, you know, I mean, my
        judgment was wrong.

NF:     You hurt me though, you hurt me.

WK:     And I am sorry for that, I did not –

NF:     You hurt me, like, you left bruises on me too by the way. I already told you about
        that. Remember I told you. I told you, I hurt to sit down, you left bruises – I
        mean – you bruised me. And you said it's because I want you to remember me.
        Do you remember that? I had huge, a huge bruise on my rear end – huge – huge –
        it literally hurt to sit down.

WK:     I –

NF:     Is that – I mean – how would you feel if someone did that – if your daughter went
        to see someone for help. You know what I mean, like, you know I was messed up
        and you took advantage of me, and I'm angry and I'm hurt and I need to resolve
        it, I need this to be resolved.

WK:     I hear – I hear that you feel that way. That wasn't my intention or goal. I wasn't
        sitting there like some predator trying to take advantage of somebody that was

7

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171                                RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                RECEIVED NYSCEF: 07/19/2017

vulnerable. I let my own feelings get the better of me, it f–ked up my judgment and I acted in a way that I should not have acted. .

NF:   Yeah. Are you sorry?

WK:   I am sorry.

NF:   Then you should say you are sorry to me. I want to hear you tell me you are sorry for what you've did.

WK:   But I've said that I am sorry to you at least four times today. I am sorry for it. I didn't expect you to wind up feeling like this that may be my fault and my error in judgment but I was not trying to hurt you. And I felt like, I felt like, in the main, our time together was valuable and that in fact, you know, I was supportive and helpful to you in getting out of that marriage and in supporting you through the beginning of it I mean, I feel like, I cared a great deal and I let those feelings get the better of me, I made a mistake and I am sorry about that. I didn't expect you to be feeling this way. I don't want you to be feeling like this. I do feel terrible.

NF:   Oh gosh.

WK:   But please don't think about this as some kind of a – you know, just taking advantage of you kind of thing cause that is not what was going on at all.

NF:   You did take advantage of me though, you did.

WK:   It was wrong.

NF:   You did, it was wrong, you took advantage of me. You know, I was so vulnerable. You know, being with Tom, I realized that, and I talked to him about it, and he was very understanding and comforting and supportive of me. But being in love just made me feel like – you know, cause you told me you loved your wife, and I said to you – then you should leave me alone . . .
No, no, no, listen to me, listen to me, listen to me. It was just – I don't know, I'm having a hard time articulating my feelings right now. I just want you to know that you almost killed me, this almost took me out.

WK:   Well, I am glad that that didn't happen.

NF:   Do you realize that you could have killed me?

WK:   That wasn't my intention.

The conversation proceeded with plaintiff repeating her accusation that defendant, a

8

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171                                                    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                                    RECEIVED NYSCEF: 07/19/2017

psychologist and psychology professor, used his position to take advantage of her, to which

defendant responded by trying to rephrase plaintiff's claim as an assertion that she *felt like*

defendant took advantage of her, which plaintiff protested was "rhetoric" and an effort to

"bullsh--" her. Defendant later proceeded:

> WK:    So let me – let me repeat myself, because what I feel the worst about in this – is
> that you feel like somebody that cared about you intentionally took advantage of
> you.
>
> NF:    You did though. That's exactly how I feel. You, you, you were supposed to care
> about me like a psychologist, you weren't supposed to
>
> WK:    and that was my mistake. I
>
> NF:    That was your mistake
>
> WK:    I am a psychologist, I am also a person. I am also a human being and I let my
> own feelings
>
> NF:    I heard that. You said that. You – but you know what – you're weak, you're
> weak though. I'm glad you're sorry though, because it – it was wrong. What you
> did to me was really bad.

After some further accusations in the same vein by plaintiff, the call was completed.

In addition, plaintiff's psychiatric expert, Dr. David Greenfeld, testified that he reviewed

plaintiff's medical records, including defendant's notes and Dr. Lerman's report, and met twice

with plaintiff. He concluded that plaintiff suffered from post traumatic stress disorder as a result

of brutal and prolonged verbal, physical and sexual abuse during her childhood. He took issue

with the diagnosis of borderline personality disorder. On cross-examination, Dr. Greenfeld

testified that none of the records he had reviewed contained a diagnosis for plaintiff of rape

trauma syndrome.

Defendant's Evidence

Defendant's testimony described at length the process of his treatment of plaintiff for

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171                                    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                    RECEIVED NYSCEF: 07/19/2017

more than two years beginning in July 2011, and his assessment of her psychological diagnosis. His direct testimony tracked treatment notes that he presented as having been made around the time of the sessions being reported. Some of his early notes described plaintiff as suffering from alcoholism as well as being "borderline," meaning having borderline personality disorder. He described plaintiff when she began treatment with him as rageful, angry, unable to sit still, threatening, and highly agitated. His notes from her second visit used the words "very sexual," which he explained was "really meant to describe a variety of different things. Sometimes it means flirtatious behavior, sometimes it means being dressed in a particularly seductive way, sometimes it means being overtly suggestive of something sexual." His notes about her third visit indicated that plaintiff typically experienced herself as a victim in situations.

Explaining a note that read "Delusional? Paranoid? Psychotic?" defendant stated that he had questioned the extent to which plaintiff is able to perceive reality accurately. Defendant also observed that plaintiff is unable to accept her share of responsibility for events that are partly of her making.

Defendant testified concerning plaintiff's two hospitalizations, in January 2012, and in May 2012, after plaintiff's mother died. Defendant recounted one of his notes, from April 2012, stating that plaintiff "started to appear much more interested in me in allowing herself to have more of a need for me and I think that's reflected in the session attendance." He continued, "It's always a very fine line to walk with Noelle between dependency, which is not a bad thing for her to develop, and an eroticized transference or a sexual dependency. Affection and sex can sometimes get confused."

In a note from July 2012, defendant stated that plaintiff's "inclination is to get people to do things for her. She can be flirtatious, seductive, cute, manipulative and easily feels wounded,

10

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171                                    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                    RECEIVED NYSCEF: 07/19/2017

rejected when this is identified or not responded to. Then becomes enraged and attacking."

According to defendant's January 3, 2013 note, plaintiff reported that her husband had raped her and was physically abusive, taking advantage of her when she was drunk. Defendant placed quotation marks around the word "rape" to indicate that he questioned plaintiff's accuracy. His next note is from January 17, 2013. The lack of any entries between January 3rd and January 17th "strongly suggest[ed]," according to defendant, that plaintiff was not there in the two intervening weeks. His note from January 17, 2013 also reflected "a very odd emergence of paranoia," such as the comment that "Dr. Shander said that she can read my mind."

Defendant testified that plaintiff's visits to him became sporadic after that, although plaintiff also sent defendant a series of emails between June 20, 2013 and June 22, 2013 that contained such declarations as, "I'm am not as f–ked up as you make me believe," and "please stop telling me I'm going to end up in a psycho ward. I would never have gone there if it were not for you and I'm sick, sick, sick of you telling me this. It's cruel." In these emails plaintiff also complained: "you have been cancelling a lot on me lately," and "[l]ately I would have really appreciated more kindness and less criticism. If you do not care, it's okay. I am used to it." Plaintiff further said, "At times you make me feel your (sic) tolerating me," and "I'm expendable. Just another f–ked up person. It probably wouldn't matter to you if I came in or not anyway."

Defendant responded to these June 20-22 emails, saying, "we should talk about all of this on Tuesday. Face to face. Not in e-mails. Please conf[i]rm that I will see you Tuesday." Plaintiff replied "F–k you." Defendant replied "Okay. That's enough. If you ever feel like coming in and talking, let me know." Her response said, "Fine if you don't ever want to see me

11

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171                                        RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                        RECEIVED NYSCEF: 07/19/2017

again. If you ever don't want to see me. You hurt me," later adding, "Whatever. I guess I really

am expendable." Defendant responded, "You have not been ditched. I asked you to come in.

You told me f–k you. Stop this. Stop writing and come in on Tuesday."

Defendant's notes concerning plaintiff's visits from June 2013 included such descriptions

of plaintiff as "school girl flirtatious," and "[f]lirtatious and easily feels rejected. Testing

boundaries. Rage." He testified that plaintiff missed or left many sessions in July and August,

and turned to his notes from September 2013. His note from September 10, 2013 said

"Reconnecting, warm and personable." The September 17, 2013 note reads, "Brought a cake

that she baked in the shape of a horseshoe. Felt I could not reject it. Even talking about it

seemed insulting to the patient. She left feeling bad."

Defendant was then directed to his notes reportedly documenting his session with

plaintiff on September 23, 2013, when she allegedly attacked him:

"sitting on the couch with plaintiff, reviewing some documents that she had asked
for help with. Out of nowhere the patient threw herself on top of me pushing me
down on my back on the couch. Laid on top of me kissing me, holding my arms
down, laughing, saying you know you want me. Stop acting like you don't.
Trying to push patient off of me without hurting her. You see I knew you liked it.
Patient had opened my pants and when she pulled on my penis I jumped up and
pushed her off. Patient was tearful for a moment then flew into a rage. You led
me on. You made me do this just to humiliate me. Here's your f–king birthday
present. Patient threw an open package on my desk and flew out of the office."

Defendant explained, in response to his attorney's question, that he had tried to push plaintiff off

him without hurting her because

"First of all, I wouldn't want to hurt her. I didn't consider this to be a hostile act.
It was coming from somewhere else. Affection, sexuality, something like that, it
didn't feel hostile or angry at all. All throughout her treatment she talked about
how easily she bruised. She has an injured shoulder that she might have just
another surgery on prior to this event. I didn't want to hurt her. I didn't want to
offend her. I wanted to get her off me. It wasn't so easy. If I was just going to
fight and throw her around, it would have been easier, but that's not what I was

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170    RECEIVED NYSCEF: 07/19/2017

trying to do."

Defendant reported that plaintiff returned for her next session on September 25, 2013, and according to his note for that date, said to him, "You know you wanted me to do that. You put the idea in my head. I saw that you liked it." His note continued, "We talked about this. Patient would have no responsibility for her actions yelling you never cared for me. I tried to challenge that, that I had some very positive feelings about her but that this was not appropriate and could not continue. Her response was you're a dick like everyone else. Everyone f–ks me over. F–k you. And the patient left."

According to defendant, that was the last session with plaintiff, although over the following months she continued to send him text messages, "some of them acting like we hadn't terminated. Some of them telling me I was a terrible person."

Importantly, on cross-examination of defendant, plaintiff's counsel called into question the viability of defendant's narrative recounting plaintiff's attack on him in September 2013. Specifically, plaintiff's counsel asked questions that effectively drew the jury's attention to the implausibility of defendant's claim that he had been unable to prevent or stop plaintiff's purported attack on him. Examples of some of those questions are:

"at some point she has her arms around you holding your arms down and at some point ... she somehow managed to unhook your belt; is that correct?" And,

"in order to release the button [of his waistband], one or two of her hands and arms would have had to come down to your waist area and therefore no longer be holding your arms down, correct?" And,

"So, during this part of this alleged event when she was undoing your belt and undoing the button and didn't have both arms as you've agreed around you, you didn't push her off you, did you?" And,

"So, she's unbuckled your belt. She's pulled down your fly and unbuttoned the series of buttons. You are struggling with getting her off of you. One of your arms is free. Then

13

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170    RECEIVED NYSCEF: 07/19/2017

you testified at your deposition she somehow also pulled your jeans down to your knees; is that correct?" And,

"So she's undone the belt, she's undone the buttons, pulled the zipper or fly buttons, pulled down your pants, all this time you are fighting to get her off of you?" And

"So she now has your pants down to your knees. Now what you say happens next is she somehow pulls your underwear down...?"

In his answers to these and other inquiries on cross-examination, defendant did not directly respond to the implication of these questions that his account was implausible. Although he asserted that he "was attempting continually throughout the entire event" to push plaintiff off him, albeit unsuccessfully, he did not provide an explanation of how she was able to keep holding him down while at least one of her hands was free to release his belt, unbutton his waistband, unzip or unbutton his fly and pull down his underwear. One such series of questions and answers was as follows:

Q:    Did she release both of her arms and come down and release your belt?

A:    I cannot tell you that detail.

Q:    If she did, then both of your arms would be free and you would be much better be able to get her off of you?

A:    You would think so.

Q:    But you didn't get her off of you at the moment she unhooked your belt?

A:    I did not.

Q:    After she somehow gets the belt open with her hand, behind that is your waistband?

A:    The waistband?

Q:    The upper part of your pants that holds your pants on. Did Noelle Feldman also

14

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM   INDEX NO. 69747/2014
NYSCEF DOC. NO. 171   RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM   INDEX NO. 69747/2014
NYSCEF DOC. NO. 170   RECEIVED NYSCEF: 07/19/2017

you know do that button?

A:     Must have, because it opened.

In addition, defendant asserted that in the course of these events he was also engaging

plaintiff in conversation, saying "This needs to not be happening. Come on. Knock this off. We

have to stop this." He estimated that the entire process took a number of minutes, which

plaintiff's counsel suggested on cross-examination was a very long time between the initiation of

the claimed attack and the time defendant finally stopped it.

When asked about the controlled phone calls, defendant testified on direct that when he

received the first controlled phone call on June 18, 2014, in which plaintiff referred to the fourth

step – which defendant explained is about taking personal responsibility – he saw that as a good

sign, especially in view of her November 2013 email in which she had accused him of doing to

her the things she had done to him in September 2013. He was also asked to explain what he

meant when he told her, during the June 18, 2014 phone call, "I felt like I could trust you." The

explanation he provided in his direct examination was,

> "So, this event happened in my office that should not have happened. And I did
> not initiate it and I did terminate it. But I don't feel good about it having
> happened. I feel like I ought to have anticipated it. I feel like some of the
> positive feelings that I've had for her sort of made me not see things the way that
> they really were. I do feel some responsibility for that happening and it's a
> terrible way to end a treatment."

When he was asked what he was apologizing for when he repeatedly said he was sorry during

the second phone call, defendant said that he was "absolutely" referring to what happened in his

office in September 2013. He stated,

> "In my mind the call had nothing to do with anything that she's alleged[]
> happened in January, because I would not even have known about that. I do feel
> bad about what happened in the office. I tried talking with her about it. I think
> you can hear on the tape, as you get to those few moments before my voice

15

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 9PM   INDEX NO. 69747/2014
NYSCEF DOC. NO. 171                                    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM   INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                    RECEIVED NYSCEF: 07/19/2017

finally kicks in, she is disagreeing with me."

Explaining what he said during the inaudible part of his responses that she was disagreeing with,

defendant testified that he was trying to tell her that "this was something that she had initiated,"

but that,

> "Clearly that was not being received. All I really was hearing was that I was a
> bad man, I was a terrible guy, and I made probably the stupidest decision of my
> life to try to just say what she wanted to hear. She started that phone call telling
> me she wanted an apology. She ended that phone call telling me she wanted an
> apology. I did truly feel bad about it. So I apologized. And I apologized clearly.
> And I took responsibility for everything and the goal really was just to quiet her
> and get off the phone and not answer it the next time."

On cross examination defendant was asked why he told plaintiff, during the phone call,

"I let myself act on those feelings," and he explained,

> "There are some things that are blended in there. I am trying to calm her down
> and I am taking responsibility for some things that were her responsibility, in my
> view. But it's also the case that I do feel bad that that incident in September even
> occurred. I do feel like my judgment — that I saw her in a more positive way than
> I ought to have seen her. I didn't anticipate this happening. I didn't predict that
> this was going to happen. I was wrong. If I hadn't been sort of feeling as positive
> about where she was at that moment, I might have been a little more critical and a
> little more cautious, but I wasn't."

When plaintiff's counsel pressed defendant about why he would have said, in the

telephone call, "I made a mistake," "I'm sorry," "I was wrong," and "my judgment was f–ked

up," when he was talking about an incident in which, according to defendant, plaintiff had

attacked him, defendant said that his apologies were in relation to plaintiff's conduct in the

September 2013 session, because "I missed something. My judgment was f–ked up. I missed

something."

Counsel asked defendant to clarify "How did your feelings get away from you with

respect to an incident where she attacked you?" Defendant responded,

16

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170    RECEIVED NYSCEF: 07/19/2017

"things had come a long way, particularly in those past few weeks. It looked like she was getting a lot better. My guard was down. I felt like she was doing well. I didn't see this more eroticized kind of transference building. Or if it wasn't just an eroticized transference I wasn't aware of the possibility that there might be drugs or drug interactions fueling this. This was not a way that I had seen Noelle before. There had been all of these different levels of acting out. Flirtatious behavior, flashing, so forth. Never did she push herself on me in the past. I did not see this coming. It's my job to see this coming."

Defendant also introduced additional psychiatric evidence. This included reading into the record the deposition testimony of Dr. Ellyn Shander, plaintiff's treating psychiatrist during the period in question. This testimony concerned Dr. Shander's participation in helping plaintiff prepare the November 14, 2013 email to defendant; it also confirmed that while plaintiff told her that defendant had touched her inappropriately; plaintiff did not say that defendant had raped her.

Defendant also called as a witness Dr. Alexander Lerman, a psychiatrist who treated plaintiff from March 29, 2006 to July 11, 2011. He testified, under subpoena, that plaintiff was "vulnerable to delusional thinking or sudden misperceptions of reality under stress." He offered several diagnoses for her, including: post traumatic stress disorder, depressive disorder not otherwise specified, and borderline personality disorder secondary to post traumatic stress disorder. He described her pattern of coming in for sessions for a brief period, engaging in a seemingly positive treatment, then not coming in for weeks to months at a time, then returning when she was experiencing a crisis.

In addition, Dr. Michael Stone was called as an psychiatric expert, to opine on plaintiff's diagnosis and the correct course of treatment.

17

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171                                          RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                          RECEIVED NYSCEF: 07/19/2017

Analysis

### CPLR 4404(a) Motion to Direct Judgment for Defendant

Defendant's motion under CPLR 4404(a) seeking to set aside the verdict and award judgment as a matter of law to defendant is denied. There is no merit to defendant's suggestion that plaintiff's testimony must be rejected as incredible as a matter of law. Long ago, the Court of Appeals explained that evidence "is 'incredible as matter of law' only where no reasonable person could accept it and base an inference upon it" (*see Blum v Fresh Grown Preserve Corp.*, 292 NY 241, 246 [1944]). Whether considered in isolation, or in conjunction with the remainder of the trial evidence, the substance of plaintiff's testimony could be reasonably accepted and legitimately form the basis for a verdict in plaintiff's favor. It is not of a nature that warrants its rejection as incredible as a matter of law.

Although it was undisputed that plaintiff did not seek medical care after January 10, 2013, and that indeed she continued treatment with defendant thereafter, and did not initially report the rape even when she reported defendant's other misconduct to the police, or her treating psychiatrist, these facts do not require the rejection of plaintiff's testimony as a matter of law. Notably, all this information was clearly emphasized to the jury. Moreover, delay in reporting rape, while a relevant consideration in evaluating a plaintiff's credibility (*see People v Derrick*, 96 AD2d 600 [2d Dept 1983]), is "[a] common characteristic of male and female rape victims" (*see People v Yates*, 168 Misc 2d 101, 107 [Sup Ct, NY County 1995], citing Mezey and King, Male Victims of Sexual Assault, at 1 [Oxford University Press 1992]). Such behavior cannot provide grounds for rejecting the assertion as a matter of law.

In seeking judgment in his favor as a matter of law, defendant also contends that the evidence of the recorded telephone calls should have been excluded, and therefore another

18

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                    RECEIVED NYSCEF: 07/19/2017

branch of his motion seeks to renew his trial motion to preclude those recordings. He again

argues that the recordings failed to satisfy the requirements of *People v Ely* (68 NY2d 520, 527

[1986]). "Admissibility of tape-recorded conversation requires proof of the accuracy or

authenticity of the tape by clear and convincing evidence establishing that the offered evidence

is genuine and that there has been no tampering with it" (*id.* at 527 [internal citations and

quotation marks omitted]). "The necessary foundation may be provided in a number of different

ways," including the testimony of a witness to the conversation or to its recording, who can

testify that it is a complete and accurate reproduction of the conversation and has not been

altered (*id.*).

There was no suggestion, or reason to suggest, that there was any inaccuracy or

tampering. Defendant never disputed that it was his voice on the recording, or claimed that what

was audible was distorted. In fact, he even remembered where he was when he received the

calls, and was able to testify as to the substance of what he said during some of the inaudible

portions of the recording. Where accuracy, authenticity and non-tampering have been

established, as here, "infirmities concerning . . . inaudibility properly go to the weight of the

evidence, not its admissibility (*People v McGee*, 49 NY2d 48, 60 [1979]; *see People v McCaw*,

137 AD3d 813, 815 [2d Dept 2016], *lv denied* 27 NY3d 1071 [2016]).

The inaudibility of defendant's portion of the conversation for the first approximately

eight minutes of the July 17, 2014 recording did not necessitate the exclusion of the entire

recording. Contrary to defendant's contention, the infirmity of the recording of defendant's side

of the interchange, even if attributable to something plaintiff unintentionally did or failed to do

during the conversation, was not due to any volitional actions on plaintiff's part intended to

prevent defendant's side from being heard.

19

Defendant relies on *People v King* (115 AD3d 873, 874-875 [2d Dept 2014]), where the

trial court "erroneously admitted into evidence a portion of an audiotape" because the "excerpt,

out of context, was misleading and unduly prejudicial, since it gave the appearance that the

defendant admitted to knowing that the gun was in his car at the time of his arrest." That ruling

is inapposite here; there was nothing misleading or unduly prejudicial in what was played for the

jury. Importantly, this Court offered to play for the jury only the portion of the recording in

which both participants' voices were audible; defendant declined that suggestion. It was only

due to defendant's decision to reject that offered option that the jury heard the entire recording.

In view of all the foregoing evidence, which was properly admissible, valid lines of

reasoning and permissible inferences allowed the jury to rationally reach its verdict in favor of

plaintiff. Defendant has not established entitlement to judgment in his favor as a matter of law

under CPLR 4401 or 4404(a).

New Trial Pursuant to CPLR 4404(a)

Nor can it be said that the verdict could not have been reached on any fair interpretation

of the evidence. Plaintiff's evidence, even considered on its own, carries enough weight to fully

support and justify the verdict. Beyond plaintiff's description of the events, several of

defendant's statements during the recorded telephone calls provided additional support. While

defendant did not explicitly agree with plaintiff's assertion that he raped her, he made statements

during their second controlled call from which the jury could infer that he was acknowledging

that he had physically done something to plaintiff that he should not have done ("I acted in a

way I should not have acted"). Even his statement during the first controlled phone call that "I

was – I was kind of shocked when I got your letter – um – you know, and a little frightened too

because I felt like I could trust you – you know, and then there was a – you know, we talked

20

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170    RECEIVED NYSCEF: 07/19/2017

about a lot of stuff, I mean, nothing, nothing just happened," while ambiguous, could at least be

understood as his recognizing that he did something to or with plaintiff for which he could get

into trouble, potentially, sexual conduct.

Moreover, the jury's determination involved not only a credibility finding in plaintiff's

favor, but a concomitant finding rejecting the credibility of defendant's competing narrative

regarding what happened between himself and plaintiff. This rejection was reasonable for a

number of reasons.

Importantly, the cross-examination of defendant regarding how it could have taken so

long, or been so difficult, to stop plaintiff's claimed attack on him, called into question the

viability of defendant's narrative recounting that purported attack on him in September 2013,

and powerfully undermined defendant's credibility. Specifically, when plaintiff's counsel asked

questions that effectively drew the jury's attention to the implausibility of defendant's claim that

he had been unable to prevent or stop plaintiff's purported attack on him, defendant's responses

failed to offer any reasonable explanation for that inability.

Also of substantial import in the weighing of the parties' competing narratives were some

of defendant's comments in the course of the recorded telephone conversations, and his

explanation of them at trial. In his trial testimony, defendant attempted to clarify his statements,

"I let my own feelings get the better of me, it f--ked up my judgment and I acted in a way that I

should not have acted," as referring not to a rape or assault by him, but to his regret for failing to

anticipate and prevent plaintiff's attack on him. But his testimony did not fully explain the parts

of his recorded statements that effectively conceded that he had affirmatively, physically, done

something to plaintiff that he should not have done. The jury could have properly rejected

defendant's alternative narrative based on his effort to explain his telephone statement, "I let

21

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 171    RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM    INDEX NO. 69747/2014
NYSCEF DOC. NO. 170    RECEIVED NYSCEF: 07/19/2017

myself act on those feelings," which explanation was virtually non-responsive. His answer did

not even refer to his own affirmative actions at all, but instead was about how he felt bad for his

failure to recognize that plaintiff would behave as he claimed she did in the September 2013

attack. Also dubious was defendant's testimony that the reason he repeatedly apologized to

plaintiff when the underlying event was, according to him, an attack by plaintiff on him, was

because he regretted his professional failure. Furthermore, defendant's answer when asked why

he said "I felt like I could trust you," during the first controlled phone call was also non-

responsive, failing to explain his use of those words, and instead focusing on his regret at failing

to anticipate her attack on him. Given defendant's strained justifications of his conduct and

statements, the jury's rejection of his credibility comported with the weight of the evidence

presented to it.

It simply cannot be said that "the evidence so preponderate[d] in favor of the [defendant]

that [the verdict] could not have been reached on any fair interpretation of the evidence" (*Lolik v*

*Big V Supermarkets*, 86 NY2d at 746). The verdict can easily be reconciled with a reasonable

view of the evidence upon a determination rejecting defendant's credibility and accepting

plaintiff's, and that decision must be accorded great deference (*see Pierre v Andre*, __ AD3d __,

2017 NY Slip Op 05253, 2017 NY App Div LEXIS 5172, *2, *supra*).

Damages

Defendant also contends that even if this Court does not set aside the jury verdict in favor

of plaintiff, it should set aside the award of punitive damages. The Court declines to do so.

"Whether to award punitive damages in a particular case, as well as the amount of such

damages, if any, are primarily questions which reside in the sound discretion of the original trier

of the facts" (*Nardelli v Stamberg*, 44 NY2d 500, 503 [1978]). As correctly charged to the jury,

22

FILED:   WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM   INDEX NO. 69747/2014
NYSCEF DOC. NO. 171   RECEIVED NYSCEF: 07/20/2017

FILED:   WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM   INDEX NO. 69747/2014
NYSCEF DOC. NO. 170   RECEIVED NYSCEF: 07/19/2017

"the standard of proof regarding the imposition of punitive damages [is] clear and convincing evidence" (*Randi A. J. v. Long Is. Surgi-Center*, 46 AD3d 74, 86 [2d Dept 2007]). It is well settled that "conduct that represents a high degree of immorality" supports an award of punitive damages (*see* 1B NY PJI 2:278 at 886; *Munoz v Puretz*, 301 AD2d 382 [1st Dept 2003]). Defendant's conduct, as found by the jury, is particularly egregious and morally culpable, given his position as plaintiff's therapist.

Finally, defendant challenges as excessive the amount awarded for both compensatory and punitive damages.

"The amount of damages to be awarded to a plaintiff for personal injuries is a question for the jury, and its determination will not be disturbed unless the award deviates materially from what would be reasonable compensation (see CPLR 5501 [c])" (*Graves v New York City Tr. Auth.*, 81 AD3d 589, 589 [2d Dept 2011]). The past and future pain and suffering award, totaling $450,000, does not deviate materially from similar cases. Indeed, in one of the two cases cited by defendant, the award for compensatory damages to a plaintiff who was raped in her dormitory was increased by the Second Department to $400,000 more than thirty years ago (*see Miller v State*, 110 AD2d 627 [2d Dept 1985]).

As to the punitive damages award, "the amount of exemplary damages awarded by a jury should not be reduced by a court unless it is so grossly excessive as to show by its very exorbitancy that it was actuated by passion" (*Nardelli v Stamberg*, 44 NY2d at 504 [citations and internal quotation marks omitted]). Defendant has not established that $500,000 was "grossly excessive" here. He offers, as analogous, an award of $200,000 in punitive damages in a violent acquaintance rape case; however, that somewhat lower award in that particular case, from 15 years ago, does not render the award here grossly excessive. Indeed, in another case cited by

23

FILED: WESTCHESTER COUNTY CLERK 07/20/2017 04:34 PM   INDEX NO. 69747/2014
NYSCEF DOC. NO. 171                                   RECEIVED NYSCEF: 07/20/2017

FILED: WESTCHESTER COUNTY CLERK 07/19/2017 10:53 AM   INDEX NO. 69747/2014
NYSCEF DOC. NO. 170                                   RECEIVED NYSCEF: 07/19/2017

defendant, *Offei v Omar* (11 Civ 4283, 2012 US Dist LEXIS 80171, 2012 WL 2086294 [SD NY 2012]), punitive damages were $100,000, although the nature of the assault constituted groping and kissing the fully clothed plaintiff, a far less egregious crime.

Based upon the foregoing, it is hereby,

ORDERED that defendant's motion is denied.

This constitutes the Decision and Order of the Court.

Dated: White Plains, New York
July 19, 2017

HON. TERRY JANE RUDERMAN, J.S.C.